**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

|  |  |
|---|---|
| KATHERINE FRIESS,<br><br>　　　　　　　　　*Plaintiff*,<br><br>　　v.<br><br>BENNIE G. THOMPSON et al.,<br><br>　　　　　　　　　*Defendants*. | No. 1:22-CV-00448-CMA-KLM |

## <u>CONGRESSIONAL DEFENDANTS' MOTION TO DISMISS</u>

Defendants the Honorable Bennie G. Thompson and the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol (collectively, the Congressional Defendants) respectfully move for an order dismissing Plaintiff Katherine Friess's Complaint (Feb. 22, 2022) (ECF 1).  For the reasons set forth in the accompanying Memorandum of Law, Ms. Friess's Complaint should be dismissed with prejudice.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER
　　*General Counsel*
TODD B. TATELMAN
　　*Principal Deputy General Counsel*
ERIC R. COLUMBUS
　　*Special Litigation Counsel*
MICHELLE S. KALLEN
　　*Special Litigation Counsel*
STACIE M. FAHSEL
　　*Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

July 11, 2022

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

KATHERINE FRIESS,

*Plaintiff*,

v.

BENNIE G. THOMPSON et al.,

*Defendants*.

No. 1:22-CV-00448-CMA-KLM

**CONGRESSIONAL DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

STANDARD OF REVIEW ......................................................................................................... 5

ARGUMENT ............................................................................................................................ 6

    I.      This Court Lacks Subject Matter Jurisdiction Over The Claims Against The
Congressional Defendants ...................................................................................................... 6

        A.      The Speech Or Debate Clause Requires Dismissal Of Ms. Friess's Claims Against
The Congressional Defendants .............................................................................................. 6

        B.      Sovereign Immunity Independently Requires Dismissal ......................................... 12

    II.    Ms. Friess Fails To State A Claim ................................................................................ 13

        A.      The Select Committee Has A Valid Legislative Purpose And The Subpoena Complies
With House Rules ................................................................................................................ 13

        B.      Ms. Friess Fails To State A First Amendment Claim................................................ 24

        C.      The Subpoena Does Not Seek Information Protected By The Attorney-Client
Privilege Or The Work Product Doctrine ............................................................................ 26

CONCLUSION...................................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 6

*Barenblatt v. United States*,
  360 U.S. 109 (1959) ............................................................................................. 26

*Barker v. Conroy*,
  921 F.3d 1118 (D.C. Cir. 2019) ....................................................................16, 23

*Barry v. U.S. ex rel. Cunningham*,
  279 U.S. 597 (1929) ...............................................................................................16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................................6

*Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*,
  860 F.2d 346 (9th Cir. 1988) ................................................................................25

*Brown & Williamson Tobacco Corp. v. Williams* ,
  62 F.3d 408 (D.C. Cir. 1995) ...............................................................................11

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ..................................................................................................25

*Budowich v. Pelosi*,
  2022 WL 2274359 (D.D.C.) .............................................................................. 9, 23

*Clarke v. Am. Com. Nat'l Bank*,
  974 F.2d 127 (9th Cir. 1992) ............................................................................... 27

*Collardey v. All. for Sustainable Energy, L.L.C.*,
  406 F. Supp. 3d 977 (D. Colo. 2019) .................................................................. 26

*Dir. of Off. of Thrift Supervision v. Ernst & Young*,
  795 F. Supp. 7 (D.D.C. 1992) .............................................................................. 27

*Doe v. McMillan*,
  412 U.S. 306 (1973) ...............................................................................................10

*Doe v. Reed*,
  561 U.S. 186 (2010) .............................................................................................. 24

*Dombrowski v. Eastland*,
  387 U.S. 82 (1967) ................................................................................................. 8

*Drummond Co. v. Collingsworth*,
    2013 WL 6074157 (N.D. Cal. Nov. 18, 2013) ...................................................... 27

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975) ................................................................... 7, 8, 11, 24

*Eastman v. Thompson*,
    No. 22-CV-00099 (C.D. Cal.) .........................................................13, 25

*ERA Franchise Sys., Inc. v. N. Ins. Co. of NY*,
    183 F.R.D. 276 (D. Kan. 1998) ...................................................... 27

*Foster v. Hill* (*In re Foster*),
    188 F.3d 1259 (10th Cir. 1999) ...................................................... 28

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
    180 F. Supp. 3d 1 (D.D.C. 2016) ...................................................... 28

*Gravel v. United States*,
    408 U.S. 606 (1972) ...................................................................... 6, 7

*Hearst v. Black*,
    87 F.2d 68 (1936) ...................................................................... 10, 11

*In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*,
    318 F.3d 379 (2d Cir. 2003) ...................................................... 27

*In re Grand Jury Proc.*,
    616 F.3d 1172 (10th Cir. 2010) ...................................................... 26

*In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, to "Custodian of Records"*,
    697 F.2d 277 (10th Cir. 1983) ...................................................... 28

*Jud. Watch, Inc. v. Schiff*,
    998 F.3d 989 (D.C. Cir. 2021) ...................................................... 8

*Keener v. Congress*,
    467 F.2d 952 (5th Cir. 1972) ...................................................... 12

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880) ...................................................................... 10

*Lane v. Peña*,
    518 U.S. 187 (1996) ...................................................................... 13

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...................................................................... 5

*McCarthy v. Pelosi*,
  5 F.4th 34 (D.C. Cir. 2021) ............................................................................ 7, 8

*McLean v. United States*,
  566 F.3d 391 (4th Cir. 2009) ............................................................................ 12

*McSurely v. McClellan*,
  521 F.2d 1024 (D.C. Cir. 1975) .......................................................................... 7
  553 F.2d 1277 (D.C. Cir. 1976)........................................................................... 8

*Meadows v. Pelosi*,
  No. 21-3217 (D.D.C.) ........................................................................................ 21

*MINPECO, S.A v. Conticommodity Servs., Inc.*,
  844 F.2d 856 (D.C. Cir. 1988) ............................................................................ 7

*Peterson v. Hatch*,
  92 F.3d 1197 (10th Cir. 1996) ............................................................................ 7

*Rangel v. Boehner*,
  20 F. Supp. 3d 148 (D.D.C. 2013) .................................................................... 15
  785 F.3d 19 (D.C. Cir. 2015)............................................................................. 10

*Republican Nat'l Comm. v. Pelosi*,
  2022 WL 1294509 (D.D.C.) ..................................................................9, 14, 20, 21

*Rockefeller v. Bingaman*,
  234 F. App'x 852 (10th Cir. 2007) .................................................................... 12

*Sadowski v. Bush*,
  293 F. Supp. 2d 15 (D.D.C. 2003) ...................................................................... 5

*Sanders v. McClellan*,
  463 F.2d 894 (D.C. Cir. 1972) .......................................................................... 12

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
  856 F.3d 1080 (D.C. Cir. 2017) .........................................................................12
  199 F. Supp. 3d 125 (D.D.C. 2016) .............................................................. 25, 26

*Sprague v. Thorn Ams., Inc.*,
  129 F.3d 1355 (10th Cir. 1997) ........................................................................ 27

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ............................................................... 1, 9, 13, 15

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) .......................................................................... 18

iv

*United States v. Bannon*,
  No. 21-670 (D.D.C.) .................................................................14

*United States v. Brewster*,
  408 U.S. 501 (1972) ................................................................ 7

*United States v. Chem. Found., Inc.*,
  272 U.S. 1 (1926) ................................................................ 16

*United States v. Durenberger*,
  48 F.3d 1239 (D.C. Cir. 1995) ................................................22

*United States v. Mitchell*,
  463 U.S. 206 (1983) ............................................................ 12

*United States v. Reynolds*,
  345 U.S. 1 (1953) ................................................................ 15

*United States v. Rostenkowski*,
  59 F.3d 1291 (D.C. Cir. 1995) .......................................... 16, 21

*Vander Jagt v. O'Neill*,
  699 F.2d 1166 (D.C. Cir. 1982) ........................................ 16, 23

*Viveros v. Nationwide Janitorial Ass'n, Inc.*,
  200 F.R.D. 681 (N.D. Ga. 2000) ........................................ 27

**Legislative & Constitutional Authorities**

26 U.S.C. §§ 8001-05 ................................................................ 16

165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019)........................17

167 Cong. Rec. H37 (daily ed. Jan. 4, 2021)..............................17

167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021)........................20

167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) ..................20

167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021)........................20

167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021)..................20

168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) .........................20

168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022).....................20

H. Rep. No. 109-377 (2006) ......................................................18

H. Res. 6, 116th Cong (2019) ....................................................19

H. Res. 24, 110th Cong (2007) ..................................................19

H. Res. 437, 109th Cong. (2005) ...............................................17

H. Res. 503, 117th Cong. (2021) ....................................................3, 4, 13, 14, 17, 18, 19, 20, 21, 23

H. Res. 730, 117th Cong. (2021) ...............................................................................................20

H. Res. 851, 117th Cong. (2021) ...............................................................................................20

H. Res. 1037, 117th Cong. (2022) .............................................................................................20

Legislative Reorganization Act of 1946, Pub. L. No. 79-601, 60 Stat. 812 (1946) .....................22

U.S. Const. Art. I, § 5, cl. 2........................................................................................................15

U.S. Const. Art. I, § 6, cl. 1..........................................................................................................6

## Rules

Fed. R. Civ. P. 12 ................................................................................................................. 5, 6

Rule I, Rules of the U.S. House of Representatives, 117th Cong. (2021)

      Rule I..............................................................................................................................17

      Rule X.............................................................................................................................16

      Rule XI......................................................................................................................22, 23

## Other

Black's Law Dictionary
  (11th ed. 2019) ................................................................................................................ 18

Katherine Friess, DOMINION VOTING SYSTEMS: OVERVIEW 12/2/20 – History,
Executives, Vote Manipulation Ability and Design, Foreign Ties,
available at https://perma.cc/BH39-JTYF .....................................................................................3

Press Release, Kevin McCarthy, U.S. House of Representatives, McCarthy Statement about
Pelosi's Abuse of Power on Jan. 6th Select Comm. (July 21, 2021),
https://perma.cc/4JNC-73R2........................................................................................................4

Press Release, Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on
Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack
on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA..................................................4

## INTRODUCTION

In this lawsuit, Plaintiff Katherine Friess seeks to prevent a validly constituted Congressional committee from "investigating the single most deadly attack on the Capitol by domestic forces" and evaluating the need for legislation to "ensur[e] the safe and uninterrupted conduct of [Congress's] constitutionally assigned business." *Trump v. Thompson*, 20 F.4th 10, 35 (D.C. Cir. 2021), *inj. denied*, 142 S. Ct. 680 (2022), *cert. denied*, 142 S. Ct. 1350 (2022) (No. 21-932).

Ms. Friess played a role in the effort by the former President of the United States to remain in office by obstructing Congress's count of the electoral votes. Specifically, Ms. Friess promulgated debunked claims that the election was stolen and sought to pressure officials to adopt that narrative and overturn the election results. The telephone records at issue are thus important to the Select Committee's investigation into the factors that fomented the attack on the Capitol and the disruption of the peaceful transfer of power.

Ms. Friess's Complaint provides no valid reason for interference with the Select Committee's critical investigation. As an initial matter, Friess's claims against the Congressional Defendants are barred by the Constitution's Speech or Debate Clause and by sovereign immunity. In any event, Ms. Friess's various claims fail on the merits. *First*, Ms. Friess is wrong that the Select Committee lacks a legitimate legislative purpose or is invalidly constituted. Every court that has considered these arguments—including the D.C. Circuit—has rejected them. *Second*, Ms. Friess's First Amendment rights are not violated by the subpoena. *Third*, Ms. Friess's attorney-client privilege claim does not shield from the Select Committee the information encompassed by the subpoena.

In short, the Complaint presses a variety of flawed legal claims to thwart the Select Committee's efforts to understand fully, and to prevent a recurrence of, the events of January 6th. The Court should dismiss the Complaint in its entirety.

## BACKGROUND

The Select Committee is investigating the facts, circumstances, and causes relating to the January 6th attack on the United States Capitol and interference with the peaceful transfer of power. This includes an examination of the influencing factors that fomented the attack on the United States Capitol, as well as how various individuals sought to marshal the resources, authority, and power of the federal government to prevent the certification of President Biden's electoral victory.

## I. The Effort To Overturn The Election And Interfere With The Peaceful Transfer Of Power

Ms. Friess, the account holder named in the subpoena at issue, is an attorney licensed to practice in Colorado and Washington, D.C. *See* Compl., Ex. B. ¶ 2. While she has "not been accused of or charged with presence at the January 6th attack on the United States Capitol," Compl. ¶ 32, she served as a personal attorney to President Trump between November 2020 and January 2021. *See id.*, Ex. B ¶ 6. She claims she was responsible for "contact[ing], coordinat[ing], and confer[ring]" with others "about matters of concern to the President." Compl. ¶ 42. Her responsibilities became "especially acute," *see id.*, when President Trump chose to reject the will of the voters, and sought out opportunities to undermine confidence in the validity of the election and improperly retain power.

After the election, Ms. Friess was one of President Trump's associates who promulgated claims that the election was fraudulent or stolen, and sought to pressure officials to adopt that

narrative and overturn the election results.  For example, Ms. Friess was credited as the author of one version of a (factually inaccurate) report alleging that Dominion Voting Systems machines were used to corruptly tamper with the results of the election in President Biden's favor.[1]  That report, and other public statements by President Trump and his associates, argued that a (quickly-corrected) tabulation error in Antrim County, Michigan was evidence of broader, fundamental problems with the election that were sufficient to place the results in Michigan, and around the country, in doubt.[2]  According to press accounts and evidence obtained by the Select Committee, Ms. Friess was deeply involved in the efforts by President Trump's team to gain access to voting machines in Antrim County and elsewhere in order to examine the machines for evidence of foreign interference or manipulation of votes.  Ms. Friess was also involved in efforts to convince elected officials to assist in overturning the results of the 2020 election or delay the certification of those results.

## II.     The Formation Of The Select Committee

In response to the unprecedented attack on the Capitol, the House of Representatives adopted House Resolution 503, "establish[ing] the Select Committee to Investigate the January 6th Attack on the United States Capitol."  H. Res. 503, 117th Cong. § 1 (2021).  The resolution authorizes the Select Committee to: (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) "issue a final

---

[1]  Katherine Friess, DOMINION VOTING SYSTEMS: OVERVIEW 12/2/20 – History, Executives, Vote Manipulation Ability and Design, Foreign Ties, *available at* https://perma.cc/BH39-JTYF.

[2]  *See, e.g.*, *id.* at 12.

report to the House containing such findings, conclusions, and recommendations for corrective measures . . . as it may deem necessary." *Id.* § 4(a)(1)-(3).

To carry out those functions, House Resolution 503 authorizes the Speaker of the House to appoint up to thirteen Members to the Select Committee, five of whom "shall be appointed after consultation with the minority leader." *Id.* § 2(a).  Consistent with the Resolution, the Speaker initially appointed seven Democrats and one Republican and then consulted with the House Minority Leader, who recommended five additional Republicans.[3]  The Speaker then spoke with the Minority Leader, advised that she would appoint three of those he had recommended, and asked the Minority Leader to recommend two other Republicans.[4]  After the Minority Leader declined to do so and, instead, withdrew all five of his recommendations, the Speaker named an additional Republican to the Select Committee.[5]  Since then, the Select Committee has functioned with seven Democrats and two Republicans.

## III.   The Select Committee's Subpoena To AT&T

In furtherance of its duty to investigate the facts, circumstances, and causes of the attack on January 6th, the Select Committee has issued subpoenas to various government agencies, private companies, and certain individuals.  The Select Committee served AT&T with a subpoena seeking subscriber information, connection records, and records of session times and

---

[3]  *See* Press Release, Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol (July 21, 2021), https://perma.cc/B86B-SJTA.

[4]  *See id.*

[5]  *See also* Press Release, Kevin McCarthy, U.S. House of Representatives, McCarthy Statement about Pelosi's Abuse of Power on Jan. 6th Select Comm. (July 21, 2021), https://perma.cc/4JNC-73R2.

durations of calls for the period of November 1, 2020, through January 31, 2021, for Ms. Friess's AT&T account.  *See* Compl., Ex. A.  The subpoena did not seek communications content or geolocation data.  *See id.*

On February 22, 2022, Ms. Friess filed this suit against the Congressional Defendants and AT&T.  *See generally* Compl.  Ms. Friess asks this Court to declare that: "Defendants' actions . . . violate federal law and the laws of the State of Colorado."  Compl. Prayer for Relief ¶ 80.b.  Specifically, the subpoena is alleged to (1) be "ultra vires," (2) violate Plaintiff's First Amendment right to associate, (3) violate attorney-client privilege, and (4) violate the rules of the House of Representatives.  *See* Compl. ¶¶ 31-79.  Ms. Friess also asks this Court to issue an injunction "enjoin[ing] Defendants' unlawful acts . . . quash[ing] the subpoena, [and] enjoin[ing] [Congressional Defendants] from enforcing the Subpoena."  Compl. Prayer for Relief ¶ 80.c. Additionally, Ms. Friess seeks monetary damages.  *Id.* ¶ 80.d.

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), Plaintiffs have the burden of establishing this Court's jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  In determining whether it has jurisdiction, the Court accepts a complaint's well-pled factual allegations as true and draws reasonable inferences in a plaintiff's favor; the court, "need not, however, accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations."  *Sadowski v. Bush*, 293 F. Supp. 2d 15, 17 (D.D.C. 2003), *dismissed as moot*, No. 03-5189, 2004 WL 547605 (D.C. Cir. Mar. 17, 2004). "Moreover, the court need not limit itself to the allegations of the complaint. . . . Rather, the court, where necessary, may consider the complaint supplemented by undisputed facts along

with the court's resolution of disputed facts to determine whether it has jurisdiction over the case." *Id.*

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

This Court lacks subject matter jurisdiction to consider Ms. Friess's claims against the Select Committee and Chairman Thompson because those claims are barred by the Speech or Debate Clause and independently by sovereign immunity. In any event, all of Ms. Friess's claims fail on the merits. Indeed, many of Ms. Friess's arguments have been correctly rejected by multiple federal courts, and Ms. Friess offers no valid reason for this Court to hold differently. Ms. Friess's Complaint should be dismissed.

## I.   This Court Lacks Subject Matter Jurisdiction Over The Claims Against The Congressional Defendants

### A.   The Speech Or Debate Clause Requires Dismissal Of Ms. Friess's Claims Against The Congressional Defendants

The Speech or Debate Clause of the Constitution bars Ms. Friess's claims against the Select Committee and Chairman Bennie Thompson. The Clause provides that Senators and Representatives "shall not be questioned in any other Place" for "any Speech or Debate in either House." U.S. Const. Art. I, § 6, cl. 1. By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause both "preserve[s] the independence and . . . integrity of the

legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975) (citation omitted).

"[I]t is long settled that the Clause's protections range beyond just the acts of speaking and debating." *McCarthy v. Pelosi*, 5 F.4th 34, 38 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 897 (2022).  Indeed, to "confine the protections of the Speech or Debate Clause to words spoken in debate would be an unacceptably narrow view." *Gravel*, 408 U.S. at 617.  The Clause has always been read "broadly" to achieve its purposes. *Eastland*, 421 U.S. at 501.  The protections of the Clause have been held to extend not only to Congress, but to its committees as well. *See, e.g.*, *Eastland*, 421 U.S. at 501; *McSurely v. McClellan*, 521 F.2d 1024, 1036-37 (D.C. Cir. 1975); *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859-61 (D.C. Cir. 1988). So long as Congress or its committees are engaged in activities "within the 'legitimate legislative sphere,'" including "participat[ion] in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation," courts have held that the Speech or Debate Clause is an absolute bar to interference. *Eastland*, 421 U.S. at 503-04; *see also Peterson v. Hatch*, 92 F.3d 1197, 1197 (10th Cir. 1996) ("Thus, 'once it is determined that Members are acting within the legitimate legislative sphere the Speech or Debate Clause is an absolute bar to interference.'" (quoting *Eastland*, 421 U.S. at 503)).

In *Eastland*, the Supreme Court applied the Speech or Debate Clause to reject a challenge to a subpoena issued by a Senate subcommittee.  There, the United States Servicemen's Fund, Inc. ("USSF") asked the Court to enjoin enforcement of a subpoena relating to the USSF's opposition to the United States' involvement in Southeast Asia. *Eastland*, 421 U.S. at 494-95.

USSF, much like Ms. Friess, filed a lawsuit alleging that the subpoena served to "harass, chill, punish and deter (USSF and its members) in their exercise of their rights and duties under the First Amendment."  *Id.* at 495.

The Supreme Court held that because the subcommittee was acting "within the legitimate legislative sphere," the Speech or Debate Clause operated as an "absolute bar" to USSF's action. *Id.* at 503.  The Supreme Court reasoned that a holding to the contrary would allow private litigation to "delay and disrupt the legislative function" and subject Congress to "judicial power" in such a way that would "imperil" Congress's "legislative independence."  *Id.*  The Court further held that the "absolute nature of the speech or debate protection" prohibited the Judiciary from intervening even though USSF alleged that its First Amendment rights had been infringed. *Id.* at 509-10.  While the Court acknowledged the "potential for abuse" created by the Clause, it noted that this was the "conscious choice of the Framers."  *Id.* at 510-11.

Indeed, since *Eastland*, the D.C. Circuit has applied the Speech or Debate Clause in numerous cases to bar challenges to various actions by Congress.  *See, e.g.*, *Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 993 (D.C. Cir. 2021) (holding that House committee's issuance of subpoenas was "a legislative act protected by the Speech or Debate Clause" and dismissing action brought by nonprofit to obtain copies of the subpoenas and responses thereto); *McCarthy*, 5 F.4th at 39 (dismissing challenge to House resolution that enabled Members to vote by proxy); *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (en banc) ("[I]nformation gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation.").

As in *Eastland*, here the Speech or Debate Clause serves as an absolute bar to Ms. Friess's suit and request for injunctive relief. *See Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (the Clause protects Members "not only from the consequences of litigation's results but also from the burden of defending themselves."). As the D.C. Circuit has already held, the Select Committee's investigation of the January 6th attack, and concomitant requests for information, constitute "a 'valid legislative purpose' and its inquiry 'concern[s] a subject on which legislation could be had.'" *Trump v. Thompson*, 20 F.4th at 41 (internal citations omitted) (affirming denial of preliminary injunction to prevent national archivist from producing records in response to Select Committee's request). Because the Select Committee's subpoena to AT&T is within this approved, legitimate legislative sphere, the Court may not interfere with Congress's independence by entertaining Ms. Friess's Complaint.

Furthermore, other district courts have recently concluded that the Speech or Debate Clause bars similar claims against Members of the House and the Select Committee challenging subpoenas issued by the Select Committee. *See Budowich v. Pelosi*, No. 21-3366, 2022 WL 2274359, at *7-8 (D.D.C. June 23, 2022) ("[T]he Speech or Debate Clause plainly immunizes the Congressional Defendants from all six of the claims against them, given that each challenge arises from a legislative act."); *Republican Nat'l Comm. ("RNC") v. Pelosi*, No. 22-659, 2022 WL 1294509, at *7-10 (D.D.C. May 1, 2022) ("[T]he Court has little trouble concluding that the Speech or Debate Clause immunizes House Defendants from this suit and that they must be dismissed for that reason."), *appeal pending*, No. 22-5123 (D.C. Cir.).

Ms. Friess's arguments that the subpoena violates the Constitution and the Select Committee's authorizing resolution (*see* Compl. ¶¶ 33, 64-69) do not change the analysis. As

explained by the D.C. Circuit, similar arguments are "made in almost every Speech or Debate Clause case" and have "been rejected time and again."  *Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015).  The Clause prevents a court from exercising jurisdiction when a "plaintiff alleges that [the act] violated the House Rules . . . or even the Constitution."  *Id.* at 24 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 203 (1880), and *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973)).  "Such is the nature of absolute immunity, which is—in a word—absolute."  *Rangel*, 785 F. 3d at 24.

The D.C. Circuit has repeatedly confirmed that the Constitutional separation of powers principle precludes the entry of injunctive relief—such as the relief sought in Ms. Friess's complaint—to impede a Congressional investigation.  In *Hearst v. Black*, the plaintiff sought to enjoin a Senate Special Committee from enforcement of a subpoena much broader than the subpoena here.  *See* 87 F.2d 68, 68 (D.C. Cir. 1936).  There, the Committee sought thousands of telegrams to and from the target of its investigation, including messages that "had no connection with the subject matter of the investigation" and which, the plaintiff argued, would "result in the disclosure of . . . privileged and private information relating to his private business affairs."  *Id.* at 69.  As here, the plaintiff argued that the investigation thereby violated his Constitutional rights.  *See id.* at 68-69.  While the D.C. Circuit accepted all the uncontested allegations of the plaintiff as true, and further assumed that the seizure of the messages had been unlawful, a unanimous panel held that no court could interfere with a Congressional investigation by suing the members of the committee.  *See id.* at 69.  The Court held that the "universal rule, so far as we know it, is that the legislative discretion in discharge of its [C]onstitutional functions, whether rightfully or wrongfully exercised, is not a subject for judicial interference."  *Id.* at 71.

*Hearst* based its holding on the separation of powers principles that animate the Speech or Debate Clause.  As the court made clear, "[n]othing is better settled than that each of the three great departments of government shall be independent and not subject to be controlled directly or indirectly by either of the others."  *Id.* at 72; *see also Eastland*, 421 U.S. at 502 ("[The Clause] reinforc[es] the separation of powers.").  And the court relied on the same Constitutional principles in rejecting the plaintiff's contention that such judicial deference to Congress and its committees in the way they conducted their investigations would lead to unaddressed Constitutional violations.  As it concluded, "[i]f it be insisted that this is the acknowledgement of a power whose plenitude may become a cataclysm, the answer is that the Congress is as much the guardian of the liberties and welfare of the people as the courts."  *Hearst*, 87 F.2d at 72 (internal quotation marks omitted).

The D.C. Circuit has further instructed that the judiciary may not interfere with Congressional investigations, even where it was alleged that Members of Congress were proceeding improperly.  *See Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 411-12 (1995) (holding that the Speech or Debate Clause barred subpoenas issued against two Members of Congress when they obtained privileged, internal documents of a tobacco manufacturer from a paralegal who allegedly stole documents from a law firm representing the tobacco manufacturer).  The D.C. Circuit explained that the protection of the Clause precluded even inquiries that would "provide clues as to what Congress is doing, or might be about to do." *Id.* at 420.  The court held that the Clause "serves to insulate Members of Congress from distractions that divert their time, energy, and attention from their legislative tasks," and that "the touchstone is interference with legislative activities."  *Id.* at 421 (internal quotations omitted).

11

Most recently, in *Senate Permanent Subcommittee on Investigations v. Ferrer*, 856 F.3d 1080, 1086 (D.C. Cir. 2017), the D.C. Circuit confirmed its rulings in *Hearst* and *Brown & Williamson*, and once again held that the courts lack jurisdiction to interfere with Congressional investigations.  In *Ferrer*, the plaintiff had partially cooperated with Congressional investigators and, upon conclusion of the investigation, sought an order directing the subcommittee "to return, destroy, or refrain from publishing the produced documents."  *Id*. at 1083.  The court held, however, that such relief was "barred by the separation of powers, including the Speech or Debate Clause."  *Id.*  The court expressly reaffirmed that "*Brown & Williamson* and *Hearst* [] make clear that" under the separation of powers, "[t]he judiciary has the duty of not lightly interfering with Congress' exercise of its legitimate powers."  *Id.* at 1086 (quoting *Sanders v. McClellan*, 463 F.2d 894, 902 (D.C. Cir. 1972)).  Accordingly, the Speech or Debate Clause requires this Court to dismiss the claims against Chairman Thompson and the Select Committee.

### B.    Sovereign Immunity Independently Requires Dismissal

Ms. Friess's suit is separately barred by the doctrine of sovereign immunity because "the United States may not be sued without its consent and . . . the existence of consent is a prerequisite for jurisdiction."  *United States. v. Mitchell*, 463 U.S. 206, 212 (1983).  That protection applies to Congress as well.  *See Keener v. Congress*, 467 F.2d 952, 953 (5th Cir. 1972); *McLean v. United States*, 566 F.3d 391, 401 (4th Cir. 2009).  Accordingly, sovereign immunity "forecloses . . . claims against the House of Representatives and Senate as institutions, and Representative[s] . . . and Senator[s] . . . as individuals acting in their official capacities."  *Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007).

A plaintiff seeking to sue the Federal Government bears the burden of identifying an applicable waiver of sovereign immunity that is "unequivocally expressed in statutory text." *Lane v. Peña*, 518 U.S. 187, 192 (1996) (waiver "will not be implied").  Ms. Friess does not and cannot point to any such waiver.  Nor can the Select Committee's actions be considered *ultra vires*; after all, the Select Committee's investigation, and attendant subpoenas, were clearly and expressly authorized by the full House and are consistent with its standing rules.  *See* H. Res 503 § 3(1).  Because no waiver of sovereign immunity applies, the claims against the Congressional Defendants must be dismissed.

## II.    Ms. Friess Fails To State A Claim

Even if Ms. Friess could overcome these jurisdictional bars, her Complaint does not state a claim on which relief can be granted.  *First*, the D.C. Circuit correctly held that the Select Committee has a valid legislative purpose, and that purpose undoubtedly encompasses the subpoena to AT&T.  Further, the Select Committee is validly constituted, as other courts have held, and the subpoena to AT&T complies with House rules and the Select Committee's authorizing resolution.  *Second*, Ms. Friess's First Amendment claim fails.  *Third*, attorney-client privilege does not shield the information the subpoena seeks.  This suit should therefore be dismissed.

### A.    The Select Committee Has A Valid Legislative Purpose And The Subpoena Complies With House Rules

**1.**  As the D.C. Circuit recently held, "the January 6th Committee plainly has a valid legislative purpose and its inquiry concern[s] a subject on which legislation could be had." *Trump v. Thompson*, 20 F.4th at 41 (internal quotation marks and citation omitted).  In reaching this holding, the D.C. Circuit described "Congress's uniquely vital interest in studying the

January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations."  *Id.* at 17.  Applying the D.C Circuit's decision in *Trump v. Thompson*, four other courts have rejected similar arguments that subpoenas issued by the Select Committee lacked a legitimate legislative purpose.  *See* Oral Arg. Tr. at 119:19-121:4, *United States v. Bannon*, No. 21-670 (June 15, 2022); *RNC*, 2022 WL 1294509, at *16-19 (D.D.C. May 1, 2022); Oral Arg. Tr. at 34, *Budowich* , ECF 27; Order Den. Pl.'s Mot. for Prelim. Inj. at 10, *Eastman v. Thompson*, No. 22-CV-00099 (C.D. Cal. Jan. 25, 2022), ECF 43.

Nonetheless, Ms. Friess's complaint repeatedly insists that the Select Committee's subpoena does not serve a valid legislative purpose, arguing that the subpoena "appears to facially serve the purpose of law enforcement" and "is being used as a general power of inquiry." Compl. ¶¶ 31-38.  But the Select Committee is not criminally investigating Ms. Friess or anyone else—nor is the Select Committee, by investigating the January 6th attack, trying to "expose [information] for the sake of exposure."  Compl. ¶ 38.  Indeed, the D.C. Circuit rejected this very argument:

> The Committee's announced purpose is to "issue a final report to the House containing such findings, conclusions, and recommendations" for such "changes in law, policy, procedures, rules, or regulations" as the Committee "may deem necessary[.]" H.R. Res. 503 § 4(a)(3), (c). . . . The mere prospect that misconduct might be exposed does not make the Committee's request prosecutorial.  Missteps and misbehavior are common fodder for legislation.

*Trump v. Thompson*, 20 F.4th at 42.  Ms. Friess offers no sound reason for this Court to reach a

different conclusion.[6]

    **2.**  The Complaint also alleges that the Select Committee was not validly formed and

lacked authority to issue the subpoena to AT&T for Ms. Friess's records.  *See* Compl. ¶¶ 62-79.

Those contentions are wrong as a matter of law.

    As an initial matter, Ms. Friess's demand that this Court override the actions of the House

and its Speaker for assertedly not following the Select Committee's authorizing resolution or

House Rules violates Constitutional separation of powers principles.  The Constitution's

Rulemaking Clause states that "[e]ach House may determine the Rules of its Proceedings."  U.S.

Const., Art. I, § 5, cl. 2.  As the D.C. Circuit has explained, the Clause "'clearly reserves to each

House of the Congress the authority to make its own rules,' and . . . interpreting a congressional

rule 'differently than would the Congress itself' is tantamount to '*making* the Rules—a power

---

    [6] Ms. Friess's complaint makes a single, passing reference to executive privilege as a
ground upon which the Select Committee's subpoena is invalid.  *See* Compl. ¶ 38.  However,
Ms. Friess is not the holder of the executive privilege and, therefore, she cannot assert it.  As the
Supreme Court has recognized, executive privilege "belongs to the Government and must be
asserted by it," and there must be a "formal claim of privilege, lodged by the head of the
department which has control over the matter, after actual personal consideration by that
officer." *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953) (upholding invocation of the state
secrets privilege involving protection of classified national security information); *see also*
Presidential Memorandum, Procedures Governing Responses to Congressional Requests for
Information 2-3 (Nov. 4, 1982), https://perma.cc/6B6N-FZ89 ("If the President decides to invoke
executive privilege, the Department Head shall advise the requesting Congressional body that the
claim of executive privilege is being made with the specific approval of the President.").

    As former President Trump has not properly invoked executive privilege with respect to
Ms. Friess or her telephone records, she cannot rely on it as a basis to challenge the Select
Committee's subpoena.

that the Rulemaking Clause reserves to each House alone.'"  *Barker v. Conroy*, 921 F.3d 1118,

1130 (D.C. Cir. 2019) (quoting *United States v. Rostenkowski*, 59 F.3d 1291, 1306-07 (D.C. Cir.

1995)); *see also Rangel v. Boehner*, 20 F. Supp. 3d 148, 167 (D.D.C. 2013).  Indeed, it is a

"startlingly unattractive idea, given [courts'] respect for a coequal branch of government, for [a

federal court] to tell the Speaker" whom to appoint to committees.  *Vander Jagt v. O'Neill*, 699

F.2d 1166, 1176 (D.C. Cir. 1982) (internal quotation marks omitted).

     In addition, Ms. Friess's arguments ignore the presumption of regularity due Congress.

*See Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 619 (1929) ("The presumption in favor of

regularity . . . cannot be denied to the proceedings of the houses of Congress, when acting upon

matters within their constitutional authority.").  None of the allegations in the Complaint comes

close to demonstrating the "clear evidence to the contrary," *United States v. Chem. Found., Inc.*,

272 U.S. 1, 14-15 (1926), required to overcome that presumption.

     Regardless, Ms. Friess's challenges to the Select Committee's composition and issuance

of the subpoena are deeply flawed.

     *First*, Ms. Friess's Complaint contends that Speaker Nancy Pelosi's appointment of nine

instead of thirteen Members to the Select Committee, and appointment of Members different

from those recommended by the Minority Leader, was contrary to the Select Committee's

authorizing resolution.  Compl. ¶¶ 64-66.  That is incorrect.

     By way of background, the House has four different kinds of committees, each of which

is established and governed by various House Rules, statutes, and House resolutions, or on an *ad

hoc* basis.  *See, e.g.*, Rule X, Rules of the U.S. House of Representatives, 117th Cong. (2021)

("House Rules") (rules governing "standing" Committees); 26 U.S.C. §§ 8001-05 (establishing

the Joint Committee on Taxation); H. Res. 503 § 1 (establishing the Select Committee); 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019) (appointment of conferees for H.J. Res. 31).  The House rules and procedures governing appointments to these four distinct types of committees vary.  Significantly, under House rules, the Speaker appoints Members for all select committees, including the one at issue here.  *See* House Rule I.11, ("[t]he Speaker shall appoint all select, joint, and conference committees ordered by the House.").  And, by unanimous consent, on January 4, 2021, the House expressly authorized the Speaker to "make appointments authorized by law or by the House."  167 Cong. Rec. H37 (daily ed. Jan. 4, 2021) (statement of Rep. Hoyer).

Ms. Friess's attack on the composition of the Select Committee fails.  House Resolution 503 states that "[t]he Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader."  H. Res. 503 § 2(a).  The plain language of the resolution does not require that *all* thirteen Members be appointed for the Select Committee to function, and the Congressional Defendants are aware of no rule or law providing that the authorization to appoint thirteen Members required that the Speaker appoint that precise number.

Indeed, the House's interpretation of its rules is strongly informed by prior practice, and precedent supports a House select committee operating with fewer than its full allotment of Members.  Specifically, in the 109th Congress, the House created the Select Committee to Investigate the Preparation for and Response to Hurricane Katrina, which allowed for twenty members, using language substantially similar to the Resolution here.  *See* H. Res. 437, 109th Cong. § 2(a) (2005) ("The select committee shall be composed of 20 members appointed by the

Speaker[.]").  Then-House Speaker Dennis Hastert appointed only eleven Members, all of whom were from the then-majority Republican Party.  *See* H. Rep. No. 109-377, at ii (2006) (listing Members).  Notably, that select committee likewise issued subpoenas.  *See id.* at 23.  This precedent strongly supports the Speaker's actions here.

Moreover, House Resolution 503 contemplates the possibility of "vacancies" but provides no specific timeline for filling them.  *See* H. Res. 503 § 2(c).  Nor does House Resolution 503 provide that the Select Committee would become invalid, or that it must suspend all action, should a vacancy occur—even though, by definition, it would have fewer than thirteen members.  *See id.*  In short, the Speaker's appointment of nine Members to the Select Committee is fully consistent with House Resolution 503.  *See infra* at 20-21.

Likewise, contrary to the Complaint's suggestion (*see* Compl. ¶ 66), the Select Committee's composition complies with the authorizing resolution's requirement that Members be chosen "after consultation with the Minority Leader."  H. Res. 503 § 2(a).  The plain language of the resolution does not, for example, authorize the Minority Leader to directly appoint a certain number of Members, nor does it require that appointments be made "upon the recommendation" of the Minority Leader.  Instead, the resolution provides the Speaker with the broader authority to simply "consult[]" with the Minority Leader regarding the appointment of minority party Members.  *See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) ("Consultation" means to "seek[] advice or information of" (internal quotation marks omitted)); *Consultation*, Black's Law Dictionary (11th ed. 2019) (defining "consultation" as "[t]he act of asking the advice or opinion of someone").  The Minority Leader's refusal to consult further after the Speaker declined to appoint two of his

recommendations does not alter the authority under House Resolution 503.  Neither the Speaker

nor the full House has interpreted House Resolution 503 to allow the Minority Leader to

unilaterally frustrate the operation of the Select Committee.  Indeed, no reasonable interpretation

of House Resolution 503 would so allow.

Had the House intended a binding role for the Minority Leader, it could have provided

for such a requirement, as it has in the past.  *See* H. Res. 6, 116th Cong. § 104(f)(1)(B) (2019)

(Select Committee on the Climate Crisis requirement that a portion of the Members be appointed

by the Speaker "on the recommendation of the Minority Leader"); *id.* § 201(b)(3) (same

requirement for Select Committee on the Modernization of Congress).  Similarly, had the House

wished to delegate appointment power directly to the Minority Leader, it could have done so.

*See*, *e.g.*, H. Res. 24, 110th Cong. § 2(a) (2007) (creating the House Democracy Assistance

Commission and allowing nine Members to "be appointed by the Minority Leader of the House

of Representatives").

Here, House Resolution 503 was followed: the Minority Leader *was* consulted.  The fact

that the Speaker—using the authority provided to her by the House Rules; the January 4, 2021,

Order of the House; and House Resolution 503—made different selections as to two Members,

and that the Minority Leader subsequently withdrew his recommendations, does not make the

Select Committee improperly constituted, nor does it invalidate any of its actions.

It is thus no surprise that every district court to have considered challenges to the Select

Committee's composition has rejected them.  As a district court recently explained in *RNC v.

Pelosi*, "the House views the Select Committee to be duly constituted and empowered to act

under its authorizing resolution, even though the Select Committee has only nine members.  This

understanding is reflected by the House's adoption of the Select Committee's recommendations to find witnesses in contempt of Congress for their refusals to comply with Select Committee subpoenas." 2022 WL 1294509, at *15. Indeed, the full House affirmatively ratified the relevant actions of the Select Committee in the face of challenges on the House floor identical to the challenges raised by Ms. Friess here.

For example, when the full House debated the resolutions recommending referral of Stephen Bannon, Mark Meadows, Peter Navarro, and Daniel Scavino, Jr. for contempt of Congress for failure to comply with Select Committee subpoenas, several Members of Congress raised the argument about the composition of the Select Committee.[7] The full House nonetheless approved the Select Committee's referrals of those four individuals for contempt of Congress.[8]

---

[7] *See, e.g.*, 167 Cong. Rec. H7793 (daily ed. Dec. 14, 2021) ("This committee is illegitimate. It has violated its own rules of creation. It has violated its own rules of creation and it says they want to find out this massive truth here about what happened on January 6. You can't have a committee to find out what happened because you are interested. You can't do that. And that is what they are doing today." (statement of Rep. Biggs)); *id.* at H7786 (contending that the Select Committee does not comply with H. Res. 503 because "the committee has zero members appointed in consultation with Leader McCarthy" and "it doesn't have 13 members" (statement of Rep. Banks)); *see also* 168 Cong. Rec. H4217 (daily ed. Apr. 6, 2022) (specifically raising challenges to the Select Committee's means of operation before the full House during its debate over whether the House should adopt a contempt resolution relating to Peter Navarro and Daniel Scavino, Jr.); 167 Cong. Rec. H5760 (daily ed. Oct. 21, 2021) (arguing, in debate on the contempt resolution for Steve Bannon, that "the subpoenas that have so far been issued do not ask for information that would meet any legitimate legislative purpose" (statement of Rep. Banks)).

[8] *See* H. Res. 730, 117th Cong. (2021) (Bannon); H. Res. 851, 117th Cong. (2021) (Meadows); H. Res. 1037, 117th Cong. (2022) (Navarro and Scavino). These resolutions were reported by the Select Committee, approved for floor consideration by the House Rules Committee, and approved by the full House. *See* 167 Cong. Rec. H5768-69 (daily ed. Oct. 21, 2021) (vote on Bannon); 167 Cong. Rec. H7814-15 (daily ed. Dec. 14, 2021) (vote on Meadows); 168 Cong. Rec. H4371-79 (daily ed. Apr. 6, 2022) (vote on Navarro and Scavino).

The House's ratification of the referrals reinforces that Ms. Friess's objections to the Select Committee's composition fail.

In rejecting the argument that House rules mandated that the Speaker appoint thirteen Members to the Select Committee, the *RNC* court further explained that the fact "that [House Resolution 503 § 2(a)] states that Speaker Pelosi 'shall' appoint thirteen members to the Select Committee is not conclusive as to whether thirteen members are required for it to lawfully operate." 2022 WL 1294509, at *15. The court concluded that if accepted the argument (which is substantially similar to Ms. Friess's argument) about the Select Committee's composition, it "would be 'interpret[ing] the Rule differently than . . . the [House] itself' and 'would effectively be making the Rules—a power that the Rulemaking Clause reserves to each House alone.'" *Id.* (quoting *Rostenkowski*, 59 F.3d at 1306-07).[9]

Three other district courts have rejected substantially similar challenges to the composition of the Select Committee. In *Budowich v. Pelosi*, Judge Boasberg held that courts must "defer to Congress in the manner of interpreting its rules," and that it would be "usurping

---

[9] In *RNC v. Pelosi*, the court described the Speaker's consultations with Minority Leader McCarthy: "House Minority Leader Kevin McCarthy recommended five more members to Speaker Pelosi: Representative Jim Banks (to serve as Ranking Member) along with Representatives Rodney Davis, Jim Jordan, Kelly Armstrong, and Troy Nehls. Speaker Pelosi agreed to appoint Representatives Davis, Armstrong, and Nehls but declined to appoint Representatives Banks and Jordan, and she asked Minority Leader McCarthy to recommend two other members. That same day, Minority Leader McCarthy decided to withdraw all five of his recommended appointees in protest." *2022 WL 1294509*, at *2 (citations omitted). Following the Minority Leader's failure to continue the consultation process, the Speaker interpreted and applied Resolution 503 and House Rules consistent with House precedents, as outlined herein. As indicated, the Constitution's Rulemaking Clause leaves no doubt that judicial deference to this application of Resolution 503 is required. *See also* Defs.' Mot. for Summ. J. at 7-8, 17-25, *Meadows v. Pelosi*, No. 21-3217 (D.D.C. Apr. 22, 2022), ECF 15.

Congressional authority" to hold that the Select Committee was not validly composed.  Oral Arg. Tr. at 34, *Budowich*, ECF 27.  Shortly thereafter, Judge Carter of the Central District of California agreed with Judge Boasberg, likewise recognizing the deference owed to the Speaker, the full House, and the Select Committee in interpreting a House resolution.  As Judge Carter explained, "[a] court may interpret internal congressional rules only when such interpretation 'requires no resolution of ambiguities.'"  Order at 9 & n.12, *Eastman*, ECF 43 (quoting *United States v. Durenberger*, 48 F.3d 1239, 1244 (D.C. Cir. 1995)).  Most recently, in denying Steve Bannon's motion to dismiss his indictment for contempt of Congress, a district court rejected Mr. Bannon's challenge to the composition of the Select Committee.  The court recognized that it "must give great weight to the interpretation of those House members charged with implementing the [authorizing] resolution and to the House itself," and "there would be potential separation of powers issues, should this or any court reject a congressional interpretation of its own rule."  Oral Arg. Tr. at 115:7-24, *Bannon*, No. 21-670.

*Second,* Ms. Friess claims that the subpoena was improperly issued because it was not issued at a meeting of the Select Committee at which a majority, or quorum, of the Select Committee Members were present.  *See* Compl. ¶¶ 67-78.  Ms. Friess's argument is incorrect as it misunderstands and misapplies the applicable House Rules.

As an initial matter, Ms. Friess incorrectly relies on the House Rule requiring that a "measure . . . may not be reported by a committee unless a majority of the committee is actually present."  *Id.* ¶ 67 (citing House Rule XI.2(h)(1)).  The term "measure" however, does not encompass a committee subpoena.  Rather, the term "measure" is a synonym for "legislative bill," which is consistent with its use in the Legislative Reorganization Act of 1946, from which

this requirement originated.  *See* Pub. L. No. 79-601, § 133(d), 60 Stat. 812, 831 (1946).  Thus, there is no requirement that committee subpoenas be issued in the presence of a quorum.

Furthermore, Ms. Friess misapplies House Rule XI.2(m) regarding the issuance of subpoenas.  While she properly notes that the Rule states that subpoenas may be issued "only when authorized by the committee or subcommittee, a majority being present," she omits the next sentence that provides an alternative method for issuance; namely, that the "power to authorize and issue subpoenas under subparagraph (1)(B) may be delegated to the chair of the committee under such rules and under such limitations as the committee may prescribe."  House Rule XI.2(m)(3)(A)(i); *see* Compl. ¶ 70.  Compounding this error, Ms. Friess incorrectly asserts that "H. Res. 503 did not change the requirement of House Rule XI, clause 2(m)."  *Id.* ¶ 71.  Contrary to Ms. Friess's assertion, House Resolution 503 expressly invokes the provision of Rule XI.2(m)(3)(A)(i) by stating that the "chair of the Select Committee may authorize and issue subpoenas pursuant to clause 2(m) of [House] rule XI."  H. Res. 503 § 5(c)(4).  Because House Resolution 503 specifically delegates to the Chairman of the Select Committee the power to authorize and issue subpoenas, it is consistent with House Rule XI.2(m)(3)(A)(i) and does not require either a meeting or the presence of a quorum.

In short, there is no basis for this Court to substitute Ms. Friess's interpretation of the Select Committee's authorizing resolution for the House's view; indeed, such a determination would be impermissible and "tantamount to 'making the [House] Rules.'"  *Barker*, 921 F.3d at 1130 (emphasis omitted); *see also* Oral Arg. Tr. at 33-34, *Budowich*, ECF 27; Order at 9 & n.12, *Eastman*, ECF 43; *Vander Jagt*, 699 F.2d at 1175.  The Select Committee and its subpoena are valid.

**B.     Ms. Friess Fails To State A First Amendment Claim**

The Complaint alleges that the subpoena violates Ms. Friess's rights under the First Amendment.  Compl. ¶¶ 39-51.  Ms. Friess suggests that this Court must subject the subpoena to "exacting scrutiny" because "political associational rights are at stake."  *Id.* ¶¶ 43-44.

To the contrary, the subpoena at issue does not implicate any "associational" activities of Ms. Friess or her associates.  After all, the subpoena does not seek the content of any communications.  Rather, the subpoena seeks "subscriber information" and "connection records and records of session times and durations."  Compl., Ex. A.  Subscriber information is limited to information about the user of the account, associated phone numbers, and other identifying numbers. "Connection records" and "records of session times and durations" simply refer to records of the date and time, duration, and sender and recipient of any call, text message, or other communication.[10]  None of this data reveals any speech protected by the First Amendment.

Further, any argument that the subpoena implicates Ms. Friess's First Amendment rights is foreclosed by *Eastland*.  There, the Supreme Court rejected an organization's argument that a Congressional subpoena's purpose was to "'harass, chill, punish, and deter' [it] in the exercise of [] First Amendment rights," explaining that the typical First Amendment balancing test "plays no part" when a Congressional subpoena is involved.  *Eastland*, 421 U.S. at 509 & n.16.  Ms. Friess's First Amendment arguments against enforcement of the Select Committee's subpoena accordingly must be dismissed.

---

[10]  Connection Records and Records of Session Times and Durations are defined in the subpoena as, "All call, message (SMS & MMS), Internet Protocol ('IP'), and data-connection detail records associated with the Phone Numbers, including all phone numbers, IP addresses, or devices that communicated with the Phone Number via delivered and undelivered inbound, outbound, and routed calls, messages, voicemail, and data connections."  Compl., Ex. A.

Even if Ms. Friess's First Amendment claim were subject to a balancing test, such balancing would favor the Select Committee's crucial investigation.  As a threshold matter, Ms. Friess's conclusory assertions that the subpoena "provides the [Select] Committee with the means to chill the First Amendment associational rights" of Ms. Friess and others "concerned with the integrity of the country's elections," Compl. ¶ 45—and that the violation of Ms. Friess's First Amendment rights "would lead to substantial and serious injury and harassment," *id.* ¶ 47—are far too amorphous to be actionable.  Courts require considerably more specificity than Ms. Friess alleges.  *See Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125, 143 (D.D.C. 2016) ("Mr. Ferrer has failed to explain the nature and scope of the subpoena's alleged intrusion into his First Amendment rights."), *aff'd*, 856 F.3d 1080 (D.C. Cir. 2017).[11]

Even if Ms. Friess were able to substantiate a legitimate interest implicated by the subpoena, it would be greatly outweighed by the Select Committee's overwhelming interest here. The Select Committee's subpoena seeks records relevant to determining the root causes of the January 6th insurrection against Congress, a "violent attack[] on the seat of our nation's government" that resulted in the "deaths of several law enforcement officers" and "deepened public distrust in our political process."  *Eastman v. Thompson*, No. 22-CV-00099, 2022 WL 894256, at *27 (C.D. Cal. Mar. 28, 2022).  This is a paradigmatic example of the governmental

---

[11]  *See also Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (stating that showing an associational injury requires demonstrating "a reasonable probability that the compelled disclosure" "will subject them to threats, harassment, or reprisals from either Government officials or private parties"); *see also Doe No. 1 v. Reed*, 561 U.S. 186, 200 (2010); *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 n.1 (9th Cir. 1988) (courts have "emphasized in each of those decisions . . . the need for objective and articulable facts, which go beyond broad allegations or subjective fears. . . . [A] merely subjective fear of future reprisals is an insufficient showing of infringement of associational rights").

interest in the "free functioning of our national institutions."  *Buckley*, 424 U.S. at 66 (citation

omitted).  Any balancing of "the competing private and public interests at stake" thus plainly

favors the Select Committee.  *Barenblatt v. United States*, 360 U.S. 109, 126 (1959); *see* Order at

12-13, *Eastman*, ECF 43 (rejecting plaintiff's First Amendment claim); *Ferrer*, 199 F. Supp. 3d

at 138-42 (same).

Accordingly, the Complaint fails to state a First Amendment claim on which relief may

be granted.

### C.   The Subpoena Does Not Seek Information Protected By The Attorney-Client Privilege Or The Work Product Doctrine

The Complaint alleges that the information sought from AT&T is protected by the

attorney-client privilege and work-product doctrines.  Compl. ¶¶ 52-61.  That is incorrect.

*First*, because the information that the subpoena seeks was *prepared by AT&T* in the

ordinary course of its business, Ms. Friess's work-product claim fails.  The work-product

doctrine "only prevents disclosure of information that was prepared by the attorney

in anticipation of litigation or for trial."  *In re Grand Jury Proc.*, 616 F.3d 1172, 1184 (10th Cir.

2010).  When considering whether a document is prepared in anticipation of litigation, the test is

"whether, in light of the nature of the document and the factual situation in the particular case,

the document can fairly be said to have been prepared or obtained because of the prospect

of litigation."  *Collardey v. All. for Sustainable Energy, LLC*, 406 F. Supp. 3d 977, 982 (D. Colo.

2019) (internal quotation marks and citation omitted).  Of course, the subscriber information and

connection records AT&T prepared were not prepared in anticipation of litigation.  They were

created so that AT&T can profitably carry out its business as a telephone company.  And, courts

have recognized that "the work product doctrine does not extend to documents . . . that were

prepared by a third party in the ordinary course of business and that would have been created in essentially similar form irrespective of any litigation anticipated by counsel." *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 384-85 (2d Cir. 2003); *see also Drummond Co. v. Collingsworth*, Nos. 13-MC-80169, 13-MC-80171, 2013 WL 6074157, at *1, *2 (N.D. Cal. Nov. 18, 2013).  The subpoena thus does not seek any protected work product.

*Second*, the attorney-client privilege does not protect the non-content information that the subpoena here seeks.  The attorney-client privilege "protects from forced disclosure any communication from an attorney to his client when made in the course of giving legal advice." *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1370 (10th Cir. 1997).  The AT&T subpoena seeks only subscriber information and connection records; it does not seek the content of any communications.  *See supra* at 24.  The mere fact that a communication occurred, and the identity of the participants in that communication, are not privileged—after all, such information is regularly disclosed in privilege logs used to support a privilege claim.  *See, e.g.*, *Dir. of Off. of Thrift Supervision v. Ernst & Young*, 795 F. Supp. 7, 13 (D.D.C. 1992).

Nor is the information privileged because it could reveal the identity of Ms. Friess's clients.  "Not all communications between attorney and client are privileged, including 'the identity of the client . . . and the general purpose of the work performed.'" *ERA Franchise Sys., Inc. v. N. Ins. Co. of NY*, 183 F.R.D. 276, 279 (D. Kan. 1998) (quoting *Clarke v. Am. Com. Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992)).  Here, there can be no serious argument that the connection records sought here are intertwined with any client confidences.  Ms. Friess has made no allegation that her clients' phone numbers alone would reveal their motives, or that any "clients sought legal advice regarding their . . . phone numbers." *Viveros v. Nationwide*

27

*Janitorial Ass'n, Inc.*, 200 F.R.D. 681, 684 (N.D. Ga. 2000).  Attorney-client privilege does not apply.

Finally, even if the attorney-client privilege or work-product doctrines were applicable, Ms. Friess's blanket invocation of those doctrines in her complaint is insufficient.  "The burden of establishing the applicability of [the attorney-client] privilege rests on the party seeking to assert it."  *In re Grand Jury Subpoena Duces Tecum Issued on June 9, 1982, to "Custodian of Records"*, 697 F.2d 277, 279 (10th Cir. 1983) (citation omitted). "The party must bear the burden as to specific questions or documents, not by making a blanket claim."  *Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1264 (10th Cir. 1999).  "This requires the party asserting privilege to adduce competent evidence in support of its claims, something beyond conclusory statements, generalized assertions, and unsworn averments of its counsel."  *FTC v. Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 15-16 (D.D.C. 2016) (internal quotation marks and citation omitted).  Ms. Friess's complaint fails to do so.  For this reason, too, Ms. Friess's privilege claim fails.

## CONCLUSION

For all the reasons stated above, the Complaint should be dismissed.

Respectfully submitted,

*/s/ Douglas N. Letter*
DOUGLAS N. LETTER
 *General Counsel*

TODD B. TATELMAN
 *Principal Deputy General Counsel*
ERIC R. COLUMBUS
 *Special Litigation Counsel*
MICHELLE S. KALLEN
 *Special Litigation Counsel*
STACIE M. FAHSEL
 *Associate General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
Telephone: (202) 225-9700
Douglas.Letter@mail.house.gov

July 11, 2022

## CERTIFICATE OF SERVICE

This document complies with the word limit set forth in D.C.COLO.LPtR 17 because this document contains 8,461 words.

I hereby certify that on July 11, 2022, I caused the foregoing document to be filed via the CM/ECF system for the U.S. District Court for the District of Colorado, which I understand caused a copy to be served on all registered parties.

*/s/ Douglas N. Letter*
Douglas N. Letter